IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-700

Filed 7 May 2024

Edgecombe County, No. 22 CVD 415

NOE ROSAS AGUILAR, Plaintiff,

v.

DILCIA ROSIBEL CHIRINOS MAYEN, Defendant.

Appeal by Plaintiff from an order entered 27 February 2023 by Judge William C. Farris in Edgecombe County District Court. Heard in the Court of Appeals 7 February 2024.

*Miller & Audino, LLP, by Jay Anthony Audino, for Plaintiff-appellant.*

*Narron & Holdford, P.A., by I. Joe Ivey, for Defendant-appellee.*

WOOD, Judge.

Noe Rosas Aguilar ("Father") appeals the trial court's order granting sole custody of the parties' minor child to Dilcia Rosibel Chirinos Mayen ("Mother"). For the reasons stated herein, we vacate and remand.

## I. **Factual and Procedural History**

Mother and Father are the biological parents of a daughter, Mariana, who was born in June 2021. Father and Mother met after he employed Mother's husband to do drywall work in his house. Father learned Mother's husband had recently arrived in the United States from Honduras and needed help. Father gathered clothes for

the family and was planning to give them to Mother's husband when he learned Mother's husband had been "locked up" after an immigration appointment and detained for approximately three months. Although married since 2008, Father began an affair with Mother while her husband was detained by immigration authorities. During that time, Father gave Mother money and at least one bag of clothes, helped to pay her bills, and eventually bought her a house. After immigration authorities released Mother's husband, he returned to live with her, but became physically abusive to her, causing her to separate from him.

Approximately one month after their relationship began, Mother noticed Father drove luxury cars and asked him what he really did for work. According to Mother, he told her he sold drugs, and Mother told him she did not want to spend time with him anymore. However, Father continued to visit her every day. Father was arrested and went to prison for selling drugs some time in 2017. After Father's release from jail, he continued to financially provide for Mother. He visited her every day to provide money and food and continued to help pay her bills.

According to Mother, Father eventually became abusive to her. Specifically, she testified he once slapped her after she told him she wanted him to leave her house. She further testified he saw her talking to a neighbor, got jealous, grabbed a machete and threatened her with it, threw her on the ground, and hit her bottom with the machete.

Father's wife, Brittany, discovered his affair with Mother in May 2021, approximately one month before Mariana was born.  Father then ended the affair. The last time Father saw Mother prior to Mariana's birth was at the baby shower, approximately three weeks prior to Mariana's birth.  After her birth, Mother told Father he should do what he can to see his daughter.  She testified he said he did not want his name on the birth certificate because it would cause problems with Brittany.

In addition to Mariana, Mother's two children from a prior relationship lived in the home with her, a ten-year-old daughter, and a seventeen-year-old son.  Mother worked at a bar called Jazmin on Thursday, Friday, Saturday, and sometimes Sunday nights, going to work approximately between 7 p.m. and 9 p.m. and returning home between 1:00 a.m. and 3:00 a.m.  Father testified Mother drank heavily at work and outside of work, brought different men home and drank with them, and would be hungover until at least lunch.  He further testified Mother's son took care of Mariana and Mother's other daughter while she was not home.  Following a report of neglect of the children in Mother's home, the Wilson County Department of Social Services filed a safety assessment on 20 April 2022 in which it reported no safety issues existed in Mother's home and closed the case.

Mother filed for child support in 2022 and submitted to DNA testing for Mariana to prove Father's paternity.  Mother testified Father called her from a private number and told her if she tried to get child support from him, he would do everything he could to take custody of Mariana.

On 7 June 2022, approximately two weeks after Mother filed for child support, Father filed a complaint, requesting temporary custody of Mariana, an *ex parte* custody order, and drug testing of Mother. Father alleged Mother was involved in illegal substance use and trafficking as well as prostitution. Along with his complaint, Father attached three exhibits which were affidavits from three of Mother's coworkers generally reaffirming Father's allegations that Mother was involved in illegal drug- and sex-related activities. The same day, the trial court entered an *ex parte* order granting custody of Mariana to Father.

A law enforcement officer accompanied Father to serve the custody complaint and to take custody of Mariana from Mother. Mother "became irate" and yelled at them. The officer served her with the complaint but left Mother's home without Mariana. On 8 June 2022, Father filed a motion to show cause for Mother's alleged contempt of court for refusing to give him custody and for a warrant directing law enforcement to take physical custody of Mariana. The trial court entered an order requiring Mother to appear for a show cause hearing and issued the requested warrant that same day. Father and law enforcement officers returned to Mother's home with the warrant and took custody of Mariana from Mother.

On 27 June 2022, Mother filed an answer to Father's complaint and a counterclaim for custody of Mariana. The return hearing on the *ex parte* order was set for the same day. The parties entered a consent order granting Father temporary custody of Mariana and granting Mother supervised visitation for two hours per week

pending a hearing on the *ex parte* order. On 11 July 2022, the parties entered a consent order whereby they would share legal and physical custody of Mariana on a temporary basis until a hearing on permanent custody.

On 13 September 2022, Mother obtained an *Ex Parte* Domestic Violence Protective Order against Father. On 20 September 2022, Father filed another motion for an *ex parte* emergency custody order and motion for modification of custody of Mariana. On 26 September 2022, the trial court entered an order directing Father and Mother to sign up for and only communicate through Our Family Wizard, jointly attend Mariana's medical appointment scheduled for 10 October 2022, follow all medical recommendations, and inform each other of all medical appointments. The trial court further ordered Mother to provide a Medicaid card for Mariana to Father. The trial also modified the existing *Ex Parte* Domestic Violence Protective Order to allow the parties to exchange the minor child with each other, provided Father's wife was not present. On 6 October 2022, the parties entered a consent order restricting Father's and Mother's contact with each other and allowing contact only during their exchanges of Mariana and also dismissing Mother's pending domestic violence action against Father.

The permanent custody trial was held on 30 and 31 January 2023. Father and Mother both presented testimony and evidence at the hearing. Father testified that when he first gained custody of Mariana, she was pale and had very dark coloration around her eyes. However, both symptoms improved after Father put her to bed

earlier and on a more regular schedule. Father also admitted photos into evidence depicting Mariana: facing forward in a car seat while in Mother's custody despite her doctor's notes recommending, she have a rear-facing car seat; lying in a crib with a blanket, pillow, and stuffed animals despite her doctor's notes recommending "no soft bedding in crib"; drinking sugary drinks such as Capri Sun and holding screens close to her face. Father testified he limited Mariana's screen time to thirty minutes per day, causing Mariana to throw tantrums, and he made sure screens were farther away from her face. He further testified he gave her water and limited the juice content in her drinks.

Mariana's medical records showed that Mother had taken Mariana to her nine-month checkup during which she was evaluated for diaper rash and given a prescription cream. The nurse practitioner told Mother she could refer Mariana to a dermatologist if she switched the primary care provider on her Medicaid card. Brittany testified Mother never sent the cream to Father after he gained custody of Mariana in June 2022. Brittany testified the diaper rash healed when Mariana was with Father and her but worsened when she was with Mother. To the contrary, however, Mother testified it was Father and Brittany who contributed to the diaper rash because the rash always appeared when Mariana was returned to her.

On 9 June 2022, the day after Father obtained custody of Mariana, Father took her to a doctor, where he learned Mother had not taken Mariana to a doctor's appointment between her two-week checkup and nine-month checkup. Mother had

missed an appointment that was scheduled for 2 September 2021. Mariana was behind on her immunizations and received five during this appointment. Mariana's medical notes from an appointment on 13 July 2022 disclosed she was well-developed, well-nourished, and had good hygiene and normal grooming.

Father testified he formed a positive relationship with Mariana. Father plays with her and helps with changing her diapers, feeding her, and putting her to bed; and she waits for him at the door when he returns from work. Father converted his dining room into a playroom for Mariana. Brittany testified that Father has a supportive extended family who help and are involved with taking care of Mariana.

Mother testified she rents a two-bedroom home for herself and her three children. Mother is from Honduras, has a fourth-grade education, and does not speak, read, or write English. She is not in the United States legally, does not have a Social Security number, and drives her car without a license.

Mother testified she loves Mariana, has a good relationship with her, and knows how to treat her. Mother took her to an emergency room regarding the much talked about diaper rash shortly after she received Mariana back from Father, after him having had exclusive physical custody of Mariana for one month. Mother also testified she has an adult babysitter who is always able to take care of her children. According to Mother, she was the primary caretaker, and Father was not involved in Mariana's life from the day she was born until he filed for custody a year later. She believes Father only filed for custody because she filed for child support. According

to Mother, Brittany constantly interferes with her relationship with Father and Mariana. Mother conceded she did not sign up for Our Family Wizard or provide Father with a copy of the Medicaid card despite the trial court's order requiring her to do so.

Maria Perez, a friend and coworker of Mother, testified Mother never engaged in prostitution or selling drugs. She further testified Mariana is a healthy and happy baby who loves her mother and is always happy when Father returns her to Mother. Jennifer Hernandez, Mariana's babysitter, testified Mother was always very good to Mariana and takes very good care of her. She further testified Mother is fully capable of caring for Mariana by herself.

At the end of the two-day permanent custody trial, the trial court verbally stated its findings and ruling on the record:

> I do find that the child is in good health and has been properly cared for all of her life, comma, solely by her mother for the first year of her life, and jointly by her mother and father and his wife for the next six months of her life. I do include, as a matter of law and order, that custody of Marianna be awarded to the mother and that the father be awarded visitation every other Friday from 6 p.m. until Monday at 6 p.m. All exchange is to take place at the Wilson County Sheriff's Department.

> When the child starts school, prekindergarten or kindergarten, the father may pick up the child from her school every other Friday and return the child to school on Monday. If the father is unable to use his weekend visitation, he shall then notify the mother as far in advance as possible. Neither parent may remove Marianna from

North Carolina without written permission from the other parent.

Counsel, I'm not going to order any holiday visitation. If you two lawyers and your clients agree, you can make such things a part of the order; otherwise, they'll just have to celebrate when they have her. We got to start cooperating in this world.

The trial court entered its written order on 27 February 2023. The order contained two findings of fact relevant to its decision:

> 3. That the minor child has been well cared for through her life, solely by Mother for the first year of her life, then jointly by the Mother, Father, and Father's wife for the next 6 months.
>
> 4. That it would be in the minor child's best interest that her care, custody and control be placed with the Mother with the Father having substantial visitation.

The trial court ordered:

> 1. That the Mother shall have sole custody of the minor child.
>
> 2. That the Father shall have visitation with the minor child every other Friday at 6:00 p.m. until Monday at 6:00 p.m.
>
> 3. . . . When the child starts pre-K or kindergarten, the Father may pick the minor child up from school every other Friday and return the child to school on Monday morning. The Father shall notify the Mother as far in advance as possible if he is not able to exercise his visitation.

Father entered a written notice of appeal on 28 March 2023.

## II. <u>Analysis</u>

On appeal, Father argues: (1) the evidence does not support Finding of Fact 3 because Mariana was not well cared for by Mother; (2) the findings of fact do not support the trial court's conclusion that it is in Mariana's best interest for Mother to have sole custody of her; (3) the trial court's failure to grant custody to Father was manifestly unsupported by reason; and (4) the trial court's failure to establish a holiday schedule for Mariana was manifestly unsupported by reason. We address each issue in turn.

## A. Standard of Review

"[T]he trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings. . . . Whether the trial court's findings of fact support its conclusions of law is reviewable *de novo*." *Scoggin v. Scoggin*, 250 N.C. App. 115, 118, 791 S.E.2d 524, 526 (2016) (brackets omitted). If the trial court's uncontested findings of fact support its conclusions of law, we must affirm the trial court's order. *Id.*

## B. Finding of Fact 3

Father argues the trial court erred when it made Finding of Fact 3 because he contends Mother did not take good care of Mariana because of issues with her health, physical safety, and emotional wellbeing.

A careful review of the record reveals substantial evidence supporting the trial court's finding that Mariana is well taken care of by Mother. Mother testified she was the primary caretaker for Mariana and knew how to take care of her. The Wilson

County Department of Social Services had investigated Mother's home after receiving a report of neglect and found no safety issues in Mother's home. Mariana's medical records were introduced into evidence and showed she was well-developed, well-nourished, and had good hygiene and normal grooming. Two witnesses for Mother, a coworker and former babysitter, testified Mother loved Mariana, takes good care of her, and does not engage in illegal activity related to drugs or prostitution. Although Father raises potential concerns such as a photo depicting Mariana in a forward-facing car seat and in a bed with a blanket, pillows, and stuffed animals despite doctor's recommendations to the contrary, "the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings." *Scoggin*, 250 N.C. App. at 118, 791 S.E.2d at 526. We hold substantial evidence supports the trial court's finding that Mariana was well taken care of by Mother.

**C. Mother's Sole Custody of Mariana**

We now address Father's next two arguments that the trial court erred together: the trial court's conclusion that it is in Mariana's best interest to grant Mother sole custody and its failure to grant custody to Father.

It is a "fundamental principle that in a contest between parents over the custody of a child the welfare of the child at the time the contest comes on for hearing is the controlling consideration." *Hardee v. Mitchell*, 230 N.C. 40, 42, 51 S.E.2d 884, 885 (1949). N.C. Gen. Stat. § 50-13.2 provides in pertinent part:

> An order for custody of a minor child entered pursuant to this section shall award the custody of such child to such person, agency, organization or institution as will best promote the interest and welfare of the child. In making the determination, *the court shall consider all relevant factors* including acts of domestic violence between the parties, the safety of the child, and the safety of either party from domestic violence by the other party. *An order for custody must include written findings of fact that reflect the consideration of each of these factors* and that support the determination of what is in the best interest of the child. Between the parents, whether natural or adoptive, no presumption shall apply as to who will better promote the interest and welfare of the child. Joint custody to the parents shall be considered upon the request of either parent."

N.C. Gen. Stat. § 50-13.2(a). "The tender years doctrine was a legal presumption that benefitted mothers in custody disputes by giving mothers custody all other factors being equal, simply based on the fact that a mother is the natural custodian of her young." *Dixon v. Gordon*, 223 N.C. App. 365, 369, 734 S.E.2d 299, 302 (2012) (quotation marks omitted) (noting the tender years doctrine has been abolished and quoting N.C. Gen. Stat. § 50-13.2(a)). N.C. Gen. Stat. § 50-13.2 further provides:

> An order for custody of a minor child may grant joint custody to the parents, exclusive custody to one person, agency, organization, or institution, or grant custody to two or more persons, agencies, organizations, or institutions. Any order for custody shall include such terms, including visitation, as will best promote the interest and welfare of the child.

N.C. Gen. Stat. § 50-13.2(b).

Here, Finding of Fact 4, stating it is in Mariana's "best interest that her care,

custody and control be placed with the Mother" is essentially a conclusion of law. *In re M.R.D.C.*, 166 N.C. App. 693, 697, 603 S.E.2d 890, 893 (2004) ("[I]f a finding of fact is essentially a conclusion of law[,] it will be treated as a conclusion of law which is reviewable on appeal.") (quotation marks, brackets, and ellipsis omitted). That leaves only Finding of Fact 3 as the sole finding of fact upon which the court based its decision to grant Mother sole custody. Although substantial evidence supports the trial court's finding that Mariana was well cared for by Mother, the trial court further found that Father and Brittany also took good care of Mariana. In other words, the trial court found that Mother, Father, and Brittany *all* provided good care for Mariana: "[T]he minor child has been well cared for through her life, solely by Mother for the first year of her life, then jointly by the Mother, Father, and Father's wife for the next 6 months." This finding of fact does not explain why it is in Mariana's best interests that Mother be granted sole custody of Mariana. We do not express an opinion on whether sole or joint custody is appropriate or even on which party is the best-suited to exercise sole custody if the trial court sees fit to order sole custody. We do, however, hold that the trial court's finding that all parties provided adequate care for Mariana, in the absence of other findings, does not support its conclusion that Mother should be granted sole custody.

The transcript is replete with evidence from which findings could be made regarding whether sole or joint custody is appropriate and a visitation schedule that is in Mariana's best interest. The trial court indeed may have *considered* all relevant

factors as required by N.C. Gen. Stat. § 50-13.2(a), but it failed to "include written findings of fact that reflect the consideration of each of these factors and that support the determination of what is in the best interest of the child" as required by the statute. Accordingly, we vacate the trial court's order and remand the matter to the trial court for it to make sufficient findings of fact to support its conclusion of law that it is in Mariana's best interest to grant Mother sole care, custody, and control. Due to the length of time that has passed since the entry of the custody order, the circumstances of the parties and the minor child may have changed, and the trial court may, in its discretion, conduct a hearing to take additional evidence.

**D. Holiday Schedule**

Father argues the trial court's failure to establish a holiday schedule was manifestly unsupported by reason. Instead of entering a holiday schedule, the trial court allowed the parties to agree on a holiday schedule or, alternatively, celebrate the holidays when they had physical custody of the child. Because we are vacating the trial court's order and remanding for entry of a new order, we need not address this issue.

### III. <u>Conclusion</u>

While the trial court's finding that Mariana was well cared for by Mother is supported by substantial evidence, its sole finding does not support its conclusion that Mariana's best interest is served by granting Mother sole custody of the minor child. We vacate the trial court's custody order and remand the matter to the trial

court to make written findings of fact in accordance with N.C. Gen. Stat. § 50-13.2(a). In its discretion, the trial court may hold a hearing to receive additional evidence to aid in making its custody determination.  It is so ordered.

VACATED AND REMANDED.

Judges COLLINS and GORE concur.